UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BRAD KUENZIG,
on behalf of himself and
all others similarly situated,

     Plaintiff,

v.                                CASE NO.:

KRAFT FOODS, INC.,
HORMEL FOODS, CORP.,          Class Action

     Defendants.

_____/

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**
**(Injunctive Relief and Damages Sought)**

Plaintiff Brad Kuenzig, on behalf of himself and others similarly situated, hereby brings this action against Defendants Kraft Foods, Inc., and Hormel Foods, Corp., and alleges as follows:

**INTRODUCTION**

1.      In recent years a proliferation of new products for sale in grocery stores has resulted in unchecked and deceptive labels on prepackaged retail sandwich meat products. At the same time that 68% of Americans are overweight or obese,[1] they have also become far more conscious of what they eat, and have proven themselves willing to pay for healthier foods as a solution to expanding waistlines and obesity related diseases. With obesity as the number two cause of preventable death in the United States, Americans are desperate for

---

[1] Centers for Disease Control and Prevention. Available at: http://www.cdc.gov/nchs/fastats/overwt.htm.

healthy options.  Into this milieu, beginning before 2006, Kraft and Hormel ("Defendants") inserted their answer to consumer demand for healthier products: new labels seemingly giving consumers what they wanted – and "labels can strongly impact consumer behavior."[2] But the meats inside have left, and continue to leave, consumers with Products many times fattier than the labels expressly claim.  As a former lobbyist for the Grocery Manufacturers Association puts it, "The goal of every food industry association is to maintain the status quo, to delay, to fight, to lobby and to obscure the facts so that manufacturers can reposition their products to compete for consumer demand."[3]

2.      This action arises from the retail sale of pre-packaged deli-style meat products with retail labels prominently touting "95% Fat Free," "96% Fat Free," "97% Fat Free," or "98% Fat Free" products (the "Percentage-Fat-Free" claims, or "___ percent fat free" claims), when the products (hereafter "Products") actually contain more than **ten times** those stated amounts of fat.  For example, Defendant Kraft Foods' label on its Oscar Mayer Honey Ham proclaims it is "**98% Fat Free · 50 calories per serving**," without further explanation. By juxtaposing the Percentage-Fat-Free claim directly beside, and often linked by a dot and in the same font as the calorie statement, Kraft is strongly suggesting to shoppers that ninety-eight percent of those fifty calories are fat free and that only one or two calories, at most, come from fat.  But that Kraft Product, instead of containing only *two* percent fat as claimed, actually contains **twenty-two** percent fat by calories.

---

[2] *Packaging's Role in Deterring Junk Food Consumption*, by Linda Casey, Packaging Digest.  April 11, 2011.
[3] *Reading Underneath the Label*, by Dr. Jane Pentz, PFP Magazine, October 2006.  Quoting former lobbyist Jeff Nadelman.  Available at www.fit-pro.com (last visited March 30, 2011).

3.      Another Kraft Product example is Oscar Mayer White Turkey, which claims it is "**95% Fat Free**," directly adjacent to the claim "**30 calories per serving**." How many of those thirty calories come from fat? Kraft has consumers believe that only *five* percent of those thirty calories are fat. That would equate to only 1½ fat calories of the total thirty calories. But in truth, fifteen of those calories come from fat. Thus, Kraft's Product is not *five* percent fat by calories, but is actually *fifty* percent fat. ***Ten times*** *the stated amount of fat.* The logical extension of this behavior, if it remains unchecked, is for Defendants to next market a product as "90% Fat Free," and that product will also be *ten times* its stated amount of fat, which means it would consist of fully *one-hundred percent* fat.

4.      Similarly, Hormel prints "98% Fat Free," or "97% Fat Free," or "96% Fat Free" prominently on the front and back labels of its Natural Choice brand Products that actually provide about twenty percent of their calories from fat.[4]

5.      Kraft's and Hormel's frauds are comprised both of affirmative misrepresentations, i.e. the Percentage-Fat-Free claims, and also of omissions. The omission arises as a result of Defendants' failures to properly disclaim their affirmative statements. Inherent ambiguity in the bare "___% fat free" claims misleads ordinary consumers acting reasonably. To avoid this result, each Percentage-Fat-Free claim must be accompanied by some sort of clarifying phrase, such as "not by calories." Absent that or a similar explanation, consumers will continue to be surprised to learn that Products they've purchased – and perhaps have repurchased for years – are about ***ten times*** the amounts of fat claimed.

---

[4] All of Defendants' Percentage-Fat-Free Products are at issue here, not merely the few listed above, which are not necessarily even the worst violators. Throughout this Complaint, "Defendants" refers to both Kraft and Hormel.

Defendantsø deceptive acts and omissions were material and induced consumers to purchase those Products.   Defendants violated their duties of good faith and fair dealing toward consumers.

6.       Defendants aggressively market their Percentage-Fat-Free Products in grocery, convenience, and other such stores across the United States.   Consumers[5] would not have purchased the Products but for the labelsø Percentage-Fat-Free claims; rather, they would have purchased the products of competitors.   Contrary to the representations made to purchasers, Defendantsø Products are in reality unable to provide anywhere close to the nutritional content promised prominently on the Productsø front labels, and the Products are therefore substantially less valuable to consumers than the labels lead consumers to reasonably believe.

## PARTIES

7.       Plaintiff Brad Kuenzig is a resident of Hillsborough County, Florida, who in the last twelve months purchased Products of both Kraftøs Oscar Mayer brand and Hormeløs Natural Choice brand at a Wal-Mart near his home in Florida.

8.       Defendant Kraft Foods Inc. is a Virginia corporation with its principal place of business in Illinois.

9.       Defendant Hormel Foods Corp. is a Delaware corporation with its principal place of business in Minnesota.

---

[5] Hereafter referred to interchangeably as õPlaintiffs,ö õClass members,ö õpurchasers,ö or õconsumers.ö

## JURISDICTION AND VENUE

10.     This court has jurisdiction over this action under 28 U.S.C. § 1332(d)(2).  The amount in controversy between the Class as defined herein and each Defendant exceeds $5,000,000, exclusive of interest and costs.  The Class as defined herein consists of individuals from fifty different states.  Further, greater than two-thirds of the Class members reside in states other than Virginia, Illinois, Delaware or Minnesota ó the states in which Defendants are citizens.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 in that Plaintiff is a resident of this district, many of the acts and transactions giving rise to this action occurred in this district, and because Defendants:

      a.  are authorized to conduct business in this district and have availed themselves of the laws and markets within this district through the promotion, marketing, distribution and sale of their products in this district;

      b.  do substantial business in this district; and

      c.  are subject to personal jurisdiction in this district.

## BACKGROUND

12.     For decades, every new meat or poultry productós label had to receive regulatory approval prior to sale to consumers, and modified labels required additional approval.  But new technologies and product developments significantly increased label submissions and regulators were unable to keep pace.  By 1994, the United States Department of Agriculture (USDA) amended its prior label approval requirements,

dramatically reducing the number of labels that industry must submit for evaluation and approval.  In 2001, the USDA pre-approved 60,000 labels ó only a fraction of those entering the retail stream of commerce.

13.     Defendants wasted no time exploiting the industryøs diminished supervision. By the early 2000s, Defendants had developed crafty labels marketing their Percentage-Fat-Free Products.  From the shelves of grocery outlets around the country ó in the U.S. Virgin Islands, Guam, America Samoa, Puerto Rico, the other U.S. territories ó and around the world for years these labels have tricked consumers into buying Products they would not have otherwise purchased.

14.     Unlike Defendants, most meat companies do not similarly mislabel their products.  Defendantsø practices are not standard in the industry.  As a consequence of their scruples, some of those honest brands have failed to gain as much additional market share as they would have if Defendants had properly labeled their products, and many have lost market share to Defendants.[6]

**The Regulatory Framework**

15.     Three federal agencies have a mandate over various aspects of prepackaged deli meat labels: The Federal Trade Commission (FTC), the United States Department of Agriculture (USDA), and the Food and Drug Administration (FDA).  The FTC regulates the truth and accuracy of marketing, and of retail labels.   The FDA regulates most food products, while the USDA is responsible for regulating the safety of meat and poultry products.  The USDA does not regulate the deceptiveness of the label statements at issue in

---

[6] See infra, õDefendantsø Marketing Successö (discussing market share around p. 18).

this case, and FDA regulations are not applied to such Products. Responsibility for the enforcement of the relevant labeling standards rests with the FTC and with the states. See Fresh Grown Preserve Corp. v. FTC, 125 F.2d 917 (2d Cir. 1942) (holding that FTC has jurisdiction to prevent false labeling, regardless of the kind of product).

16. The FTC has authority to regulate prepackaged deli meat retail labels. The Federal Trade Commission Act:

> specifically states that the FTC shall prohibit the false advertisement of "foods, drugs, and cosmetics." Although the definition of "advertisement" excludes labeling, FTC has additional authority pursuant to section 5 of the FTC Act to prevent "unfair or deceptive acts or practices in or affecting commerce." This broad authority enables FTC to proceed against all unfair business practices, including false and misleading labeling of food products.[7]

Federal regulations promulgated by the FTC govern product labels and specifically forbid misleading claims. The FTC will find that deception has occurred "if there is a representation, omission or practice that is likely to mislead the consumer acting reasonably in the circumstances."[8] Deception has occurred here and Plaintiff is of average or above-average intelligence, and is an ordinary consumer. Although the Plaintiff acted reasonably when purchasing the Products, Plaintiff was deceived by the Products' labels to believe that, depending on the Product, only two, three, four, or five calories out of one hundred, depending on the "___% fat free" claim made on the labels, were comprised by fat.

17. The FDA, under the Federal Food, Drug and Cosmetic Act (FFDCA) and the Fair Packaging and Labeling Act (FPLA), is also charged with establishing labeling

---

[7] *A Guide to Federal Food Labeling Requirements for Meat and Poultry Products*, (hereafter "*Guide*") p. 11 (citing 15 U.S.C. §§ 45, 52). Edited by R. Post *et al.*, The Labeling and Consumer Protection Staff, Office of Policy, Program, and Employee Development, FSIS, USDA. August 2007. Written by Hogan & Hartson, LLP.
[8] *Deception Policy Statement*, appended to Cliffdale Associates, Inc., 103 F.T.C. 110, 174 (1984).

standards for foods subject to FDA regulations.  Which foods are subject to FDA regulations is determined based on the food's formulation rather than the composition of the finished product.  It has long been settled that the FDA does not have exclusive jurisdiction over false and misleading labeling, but instead shares that jurisdiction with the FTC.  <u>Houbigant v. Federal Trade Commission</u>, 139 F.2d 1019 (2d Cir. 1944) (upholding FTC's authority to proceed against the false labeling of food products).  The formulation of the Percentage-Fat-Free Products, as greater than ten percent meat or poultry, invites the USDA to regulate them too.[9]

18.     The USDA, under the Federal Meat Inspection Act (FMIA) and the Poultry Products Inspection Act (PPIA), is charged with ensuring that meat and poultry products are wholesome and unadulterated, and are properly branded and labeled with respect to those concerns.  The USDA, through its Food Safety and Inspection Service (FSIS) conducts sanitation inspections of slaughtering and packaging establishments and monitors limited aspects of certain labels to enforce standards of product composition or identity.  21 U.S.C. §§ 453(h), 457(b), (c), 601(n), 607(b)-9e).   For example, FSIS makes sure that a turkey product is not wrongly labeled as chicken, that it is fit for human consumption, and that USDA "Inspected and passed" stamps on labels are proper.  21 U.S.C. §§ 451 *et seq.*, 601 *et seq.*

19.     By including the USDA's meat-inspection stamp or legend on an already misleading label, Defendants compound the deception by adding the imprimatur of a federal agency, the USDA, which did not approve, or inadequately approved, the label's accuracy.

---

[9] *Guide* at 9.

The only meaning that the USDA intends its inspection label to convey is to show "that a carcass or parts of carcasses were inspected and passed by FSIS in an official establishment."[10]

## DEFENDANTS' DECEPTIVE CLAIMS

20.     Plaintiff is informed and believes and thereon alleges that Defendants' willingness to deceptively label their Products was driven by the enormous profits that Defendants were able to realize from the consumer shift toward healthier foods.  Defendants intended to deceive consumers; Defendants knew or should have known that consumers would believe the labels' claims, and would rely thereon when purchasing Defendants' Products.

21.     State common law and statutes forbid misleading labeling, as do federal law and regulations.[11]  Defendants violate the letter and spirit of these laws and regulations through the placement, size and designs of their Percentage-Fat-Free statements, and through the omission of disclaimers or explanatory phrases necessary to avoid misleading their consumers.

### Kraft's Claims About Oscar Mayer Meats

22.     Kraft employs a clever psychological technique to trick consumers into believing that its Percentage-Fat-Free claims are calculated based on calories.  On many of Kraft's labels, in the same size and color of font, and immediately adjacent to the Percentage-Fat-Free claims, Kraft lists the calories per serving.  The Percentage-Fat-Free

---

[10] *Guide* at 35.
[11] See, e.g., 9 C.F.R. §§ 317.2(b), 381.115(b) (requiring that, in comparison to extraneous words, statements and designs, the required label information, i.e. product name, net weight, ingredients and the like, must be prominently and conspicuously displayed).

claim and the calorie statement are also linked by a small hyphen, or dot, indicating elaboration. Ordinary consumers reasonably interpret these statements as modifying each other. Kraft also places its Percentage-Fat-Free claims prominently at the top of its labels, ensuring that the Percentage-Fat-Free claims will be the first thing consumers notice.

23.     In the example pictured below, the "98% fat free" claim seems to modify the "50 calories per serving" statement, or vice versa, naturally leading consumers to believe that only two percent of those fifty calories will come from fat. The omission of any other qualifying statement furthers Kraft's deception. For two servings, comprising 100 calories, Kraft's label would have consumers believe that ninety-eight of those calories are fat-free. Kraft wants consumers to conclude that only two of those hundred calories come from fat.



24.     And Kraft has succeeded, because its labels have tricked everyone who Plaintiff's counsel has spoken to about it.  Without exception, people who have earned medical degrees, PhDs, JDs, masters' degrees, and people with decades of real-world experience, including financiers, developers and executives, all have been deceived by Kraft's labels.

25.     In truth, the figure is not "two" of those calories that come from fat, but actually 20 calories: *ten times* the amount of fat that Kraft claims on its label.  And Kraft is responsible for dozens of such Oscar Mayer brand labels entering the marketplace including at least:



a.  "95% fat free · 30 calories per serving" White Turkey, which

actually yields 15 fat calories per serving.  True percentage of fat, a whopping: **50% fat** (pictured above).

b.   "98% fat free · 45 calories per serving" Smoked Turkey Breast, which actually yields 10 fat calories per serving.  Ten divided by 45 returns the percentage of fat: **22% fat**.

c.   "96% fat free · 60 calories per serving" Smoked Ham, which actually yields 20 fat calories per serving.  True percentage of fat: **33% fat**.

d.   "98% fat free · 50 calories per serving" Mesquite Turkey Breast, which actually yields 10 fat calories per serving.  True percentage of fat: **20% fat**.

e.   "97% fat free · 50 calories per serving" Virginia Brand Ham, which actually yields 10 fat calories per serving.  True percentage of fat: **20% fat**.

f.   "96% fat free · 60 calories per serving" Slow Roasted Roast Beef, which actually yields 15 fat calories per serving.  True percentage of fat: **25% fat**.

g.   "98% fat free · 50 calories per serving" Honey Ham, which actually yields 10 fat calories per serving.  True percentage of fat: **20% fat**.

h.   "98% fat free · 45 calories per serving" Smoked Ham,[12] which

---

[12] Kraft sells at least two Smoked Ham varieties, each claiming a different Percentage-Fat-Free.

actually yields 10 fat calories per serving.  True percentage of fat: **22% fat**.

    i.   õ98% fat free · 60 calories per servingö Brown Sugar Ham, which actually yields 10 fat calories per serving.  True percentage of fat: **17% fat**.

    j.   õ98% fat free · 45 calories per servingö Oven Roasted Turkey, which actually yields 10 fat calories per serving.  True percentage of fat: **22% fat**.

26.     Kraftøs labels such as those described above appear on Products containing various amounts of meat, including at least 6 ounce, 9 ounce, and 16 ounce containers.  Such labels continue this very day to deceive consumers.

**Kraft's Own Substantiation Demonstrates the Falsity of Its Claims**

27.     Through the Nutrition Labeling and Education Act, the FDA has long required that food manufacturers include a nutrition panel on their labels that discloses, among other things, the calories per serving and the number of those calories that come from fat.  In 1994, the USDA adopted similar requirements for pre-packaged meats.[13]  On the backside of the Products, in small panels there are numbers that, through a calculation, reveal the deception of the prominently placed Percentage-Fat-Free claims.

28.     Kraftøs nutrition panels are located on the back side of their Products, and although there is ample space for a much larger panel, Kraft has intentionally provided the required nutrition information in the smallest permissible font.

---

[13] 9 C.F.R. §§ 317.309(c), 381.409(c).

29.     Kraft could have easily doubled the size of the nutrition label on its "98% fat free · 50 calories per serving" Cracked Black Pepper Turkey (pictured below).  But Kraft knows that smaller labels deter people from trying to read them.



30.     On the left-hand side of the above-pictured label, it reads:

Calories 50
Fat Cal 10

From this information, the true percentage of fat in the product can be calculated by dividing the fat calories, "Fat Cal," by the total calories per serving: 10 ÷ 50.  The result of this formula provides the actual percentage of fat calories in the Products.  For the Product

pictured above, 10 ÷ 50 = 0.20, more commonly understood as 20%.  Kraft labels this Product as 2% fat.

**Hormel Products Share Shelf Space With Kraft's**

31.      Kraft's ubiquitous Products and marketing might enable Kraft to persuade retailers into providing the shelf placement it wants – Kraft wants its Products everywhere and that's what it gets.   "This is a war where battles are fought over inches of shelf space…."[14]  Kraft spends over $850 million annually on marketing and shelf placement.  In response, "[g]rocers are listening, and in many cases they're handing Kraft the keys to the storeroom, giving it power to make decisions about product placement, promotions and pricing…."[15]

32.      "'Kraft is the go-to supplier,' says [a consultant] … which each year asks retailers to rank suppliers in several strategic categories.  Last year, for the first time, Kraft overtook Proctor & Gamble as the highest-ranked supplier."[16]  The other Defendant, Hormel, though possessing less influence with retailers, has ridden Kraft's coattails.  Hormel knows that its Products will occupy shelf space beside Kraft's Oscar Mayer brand.

33.      Consumers browsing the lunchmeat sections of grocery stores see Kraft's claims and Hormel's remarkably similar claims.   Kraft affirmatively states that its Percentage-Fat-Free claim refers to calories.  Hormel's identical Percentage-Fat-Free claims lead consumers to believe that both companies are using the same measure, i.e. calories, to make those claims.

---

[14] *Shelf-Determination*, by B. Copple.  Forbes, 4/15/2002.  <u>See</u>
http://www.forbes.com/forbes/2002/0415/130.html.
[15] <u>Id.</u>
[16] <u>Id.</u>

34.     Hormel is liable for fraud by action and omission.   The only phrase modifying or otherwise explaining either Defendant's Percentage-Fat-Free claims is found on Kraft's Products, with statements such as "98% fat free · **45 calories per serving**."   By making claims identical to Kraft's, Hormel is deceiving consumers by failing to explain its own "___% fat free" statements.   Due in part to the absence of any disclaimer or explanation, ordinary consumers acting reasonably have construed Hormel's claims to refer to calories in the same way Kraft's expressly do.

### Hormel's Claims About Its Meats

35.     Hormel makes its Percentage-Fat-Free claims in a leaf shape prominently jutting out from an otherwise complete oval.   This is carefully designed to draw the consumer's gaze to the Percentage-Fat-Free claim.   Hormel states its claim on the front label to induce consumers to purchase its Products, and it also makes the same claim again on the back label above the required nutrition panel.

36.     On the back label, the Percentage-Fat-Free claim again sticks out from an otherwise uninterrupted oval shape.   Hormel arranges its back label claim specifically to convince consumers that they don't need to bother looking at the details of the nutrition panel, and that they can rely on the larger, more colorful and more inviting print instead.

37.     In the Product pictured below, Hormel is advertising its Natural Choice brand Mesquite Deli Turkey as being "**98% Fat Free**."   In truth, this Hormel Product is not *two* percent fat, but instead is ***seventeen*** percent fat.



38.     Hormel has succeeded in misleading consumers.  Without exception, people who have earned medical degrees, PhDs, JDs, masters' degrees, and people with decades of real-world experience have all interpreted Hormel's claims to refer to calories from fat.

39.     In addition to the Mesquite Deli Turkey described above, Hormel is responsible for several different deceptive Natural Choice labels, including at least:

a.  "97% Fat Free" Smoked Deli Ham, which delivers 60 calories per serving, 15 of those from fat.  True percentage of fat: **25% fat**.

b.  "98% Fat Free" Oven Roasted Deli Turkey, which provides 60 calories per serving, 10 of which come from fat.  True percentage of fat: **17% fat**.

    c.   "97% Free" Brown Sugar Deli Ham, which provides 70 calories per serving, 15 of those from fat.  True percentage of fat: **21% fat**.

    d.   "97% Fat Free" Honey Deli Ham, which also provides 70 calories per serving, 15 of those from fat.  True percentage of fat: **21% fat**.

    e.   "98% Fat Free" Smoked Deli Turkey, which delivers 60 calories per serving, 10 of those from fat.  True percentage of fat: **17% fat**.

    f.   "98% Fat Free" Honey Deli Turkey, which delivers 60 calories per serving, 10 of those from fat.  True percentage of fat: **17% fat**.

    g.   "96% Fat Free" Cooked Deli Ham, which delivers 60 calories per serving, 20 of those from fat.  True percentage of fat: **33% fat**.

40.      Hormel's labels appear on Products containing various amounts of meat, including at least 6 ounce, 8 ounce, and 12 ounce containers.  Such labels continue this very day deceiving consumers.

**Hormel's Own Substantiation Demonstrates the Falsity of Its Claims**

41.      On the back side of its Products, Hormel lists the calories per serving, the serving size, and the calories from fat.  Like Kraft's, Hormel's nutritional panel could be several times larger than it actually is – more than enough space exists on the back of the Products.  But Hormel knows that the smaller the font, the less likely consumers are to read it.  That's why, on the back of its Products, Hormel prints its Percentage-Fat-Free claim large and prominently, sticking out from an otherwise uninterrupted oval shape.



42.     The formula for calculating the percentage of the Products that are actually fat is: calories from fat divided by total calories.

43.     The nutritional panel for the Hormel Product pictured above says:

**Calories**  60     Calories from Fat  10

From this information, the actual percentage of fat in the Product can be calculated by dividing the fat calories by the total calories per serving: $10 \div 60$.  The result of this formula provides the actual percentage of fat calories in the Product.  For the Product pictured above, $10 \div 60 = 0.1667$, more commonly understood as 17%.  Hormel labels this Product as containing only 2% fat.

19

## DEFENDANT'S MARKETING SUCCESS

44.　　Defendants' mislabeling of their Products has enabled them to catch the health-trend wave – the one that everyone from family doctors to the first lady is talking about – and ride the rising tide of demand for healthy products.  The Defendants' deceptions have boosted both their profits per unit of meat sold and their market shares far beyond those of their moral-bound competitors.

### Kraft and Hormel Gained Substantial Market Share

45.　　Defendants' market share gains are evidenced by their sales increases compared to the growth of their industry.  The Products of both Kraft and Hormel are both in the same industry category, and both have outpaced their industry's growth, which typically increases one to two percent annually.　"Sales for the categories Oscar Mayer competes in, such as lunch meat… typically rise about 1 percent to 2 percent a year,"[17] according to Nick Meriggioli, group vice president, and president for the convenient meals sector of Kraft.  All of the Defendants are in the same industry category as Kraft's Oscar Mayer.

46.　　Through the unfair competitive advantage Kraft gained by deceptively marketing its Products, Kraft has perpetually surpassed the market's one to two percent growth.  In 2006, Oscar Mayer "sales rose more than 8 percent to about $3 billion."[18]  In other words, Kraft's market share rose between *four and eight times* faster than its competitors' market shares.　"…Our growth has truly accelerated over the last couple of

---

[17] *Corrected – Update 1-Kraft Sees Adequate Supplies for Oscar Mayer*, by Brad Dorfman.  April 10, 2007 (citing Nick Meriggioli, group vice president and president for the convenient meals sector of Kraft).  Available at http://www.reuters.com/article/2007/04/10/kraft-oscarmayer-idUSN1043088520070410 (last visited April 7, 2011).

[18] Id. (during that same year, 2006, Kraft's total sales increased less than 1 percent).

years,ø said Kraftøs Meriggioli.  Oscar Mayer has launched about 40 new products since 2004 to help drive growth, including a line of shaved deli-style meats *it launched after the company saw its market share slipping*, he said.ö[19]

47.     Kraftøs deceptive marketing successfully stopped the companyøs sliding lunchmeat market share, and turned it around entirely.  From 2006 to 2010, Kraftøs Oscar Mayer sales increased from $3 billion to $4.8 billion: a 63% increase in a mere four years. Thatøs an average annual market share increase of 15% in a market where a 2% increase is good.  And, according to Kraftøs own Meriggioli, that increase is thanks to the line of deli-style meats that the company launched when it saw its market share slipping.  This action asks that those ill-gotten gains be returned to the consumers who Kraft defrauded.

48.     Neck and neck with Kraft is Hormel.  According to the company, Hormel has ö34 brands that enjoy the number one or two market share position.ö[20]  In March of 2009, Hormel CEO Jeffrey Ettinger östressed the importance of being the No. 1 or No. 2 brand in the market to compete against lower-priced products.ö[21]  Hormeløs 2006 sales of $5.7 billion climbed to $7.2 billion in 2010,[22] for an average annual increase of 6.6% ó *three to six times* the industryøs annual growth rate.     Thanks to the success of its deceptively marketed Products, öHormel Foods has been ranked as one of ÷The 25 Best Manufacturing Companies To Sell Forø by *Selling Power* magazine.ö[23]  That accolade rests heavily on the backs of consumers.

---

[19] Id. (emphasis added).  Those 40 new products were launched between 2004 and 2006.

[20] See http://www.wikinvest.com/stock/Hormel_Foods_%28HRL%29 (last visited 4/7/2011).

[21] *Hormel Expects More Marketing Spending in 2009*, Reuters.  Available at: http://www.reuters.com/ article/2009/03/16/us-food-summit-hormel-advertising-idUSTRE52F68H20090316 (last visited 4/7/2011).

[22] Hormel Annual Report for fiscal year ending Oct. 2010, p. 12.

[23] http://www.hormelfoods.com/careers/workplace/corporateProfile.aspx (last visted 4/7/2011).

## CLASS ACTION ALLEGATIONS

49.     The Plaintiff brings this action on behalf of himself and proposed plaintiff

Class members under Rules 23(b)(2) and (3) of the Federal Rules of Civil Procedure. The

proposed Class consists of:

> All persons who purchased in the United States the deli-meat-style food
> products marketed and distributed by Defendants, labeled with Percentage-
> Fat-Free claims between April 2006 and the present. Excluded from the Class
> are those who purchased the products for resale; members of the federal
> judiciary and their relatives; and Defendants' officers, directors and
> employees.

50.     While the exact number of Class members is unknown to the Plaintiff at this

time, based on a review of available records and evidence, including Defendants' annual

reports, there are at least hundreds of thousands – and likely millions – of members of the

proposed Class. The Class is so numerous that joinder of all members of the Class is

impracticable.

51.     This action involves questions of fact common to all Class members because

all Class members purchased products with substantially similar labels.

52.     This action involves question of law common to all Class members because:

    a.  Each state has enacted laws comparable to the Federal Trade

        Commission Act, known as "little FTC" acts, which provide private

        causes of action with sufficient uniformity that the standardized terms

        of the Defendants' deceptive, misleading, and unfair product labels

        violated the "little FTC" acts of each state in the same way; and

    b.  Under the common law of contracts, the intentionally misleading label

        claims and omissions are material to the contract formed upon the

22

consumers' acceptances of the Defendants' offers for sale.

53.    Plaintiff's claims are typical of those of other members of the Class as there are no material differences in the facts and law underlying the claims of Plaintiff and the Class and by prosecuting his claims Plaintiff will advance the claims of Class members.

54.    The common questions of law and fact among all Class members predominate over any issues affecting individual members of the Class, including but not limited to:

a.   whether Kraft's claims on its labels, concerning the Products' provision of the caloric percentage-fat-free nutritional content, are true, or are misleading, or reasonably likely to deceive;

b.   whether Hormel's claims on its labels, concerning the Products' provision of the percentage-fat-free nutritional content, are true, or are misleading, or reasonably likely to deceive;

c.   whether Defendants intended to trick consumers into believing that the percentage-fat-free claims on the Products' labels;

d.   whether the alleged conduct constitutes violations of the laws asserted herein;

e.   whether Plaintiff and Class members are entitled to declaratory and injunctive relief;

f.   whether Plaintiff and Class members have sustained monetary loss and the proper measure of that loss;

g.   whether Plaintiff and Class members have sustained consequential

loss, and to what measure; and

h.   whether Defendants' acts and omissions warrant punitive damages.

55.   Plaintiff's claims are typical of the claims of the proposed Class, and Plaintiff will fairly and adequately represent and protect the interests of the proposed Class.  Plaintiff has retained counsel competent and experienced in the prosecution of this type of litigation.

56.   The questions of law and fact common to the Class members, some of which are set out above, predominate over any questions affecting only individual Class members.

57.   Class treatment of the claims set forth herein is superior to other available methods for the fair and efficient adjudication of this controversy.  The expense and burden of individual litigation would make it impracticable or impossible for proposed Class members to prosecute their claims individually.  Absent a class action, a multiplicity of individual lawsuits would be required to address the claims between Class members and Defendants, and inconsistent treatment and adjudication of the claims would likely result.

58.   The litigation and trial of Plaintiff's claims is manageable.  The standardized labels at issue, the consistent provisions of the "little FTC" acts, and the readily ascertainable identities of many Class members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

59.   Defendants have acted or refused to act on grounds that apply generally to the Class so that final injunctive relief and corresponding declaratory relief are appropriate.

60.   Unless a class-wide injunction is issued, Defendants will continue to commit the violations alleged, and the members of the Class and the general public will continue to be misled.

61.     Unless a class is certified, Defendants will retain monies received as a result of their conduct, money that was taken from Plaintiff and proposed Class members.

62.     Defendants have acted and refused to act on grounds generally applicable to the Class, making appropriate final injunctive relief with respect to the Class as a whole.

63.     Defendants' acts and omissions are the direct and proximate cause of damage as described in the following Counts:

## COUNT I
### (Injunction and Declaration)

64.     Plaintiff re-alleges and incorporates by reference the allegations contained in the paragraphs above as if fully set forth here.

65.     Plaintiff purchased Kraft's "98% Fat Free · 45 calories per serving" Oscar Mayer Turkey in the 16 ounce size from Wal-Mart in the last twelve months.  References throughout these Counts to Kraft's Product refer to Kraft's "98% Fat Free · 45 calories per serving" Oscar Mayer Turkey.

66.     Plaintiff relied on Hormel's express warranty and purchased Hormel's Natural Choice "98% Fat Free" Turkey from Wal-Mart in the last twelve months. References throughout these Counts to Hormel's Product refer to Hormel's "98% Fat Free" Turkey.

67.     References throughout these Counts to "Defendants" means each Defendant individually: (1) Kraft, and, separately (2) Hormel.

68.     Kraft and Hormel each know that the marketing of their Products as Percentage-Fat-Free deceives ordinary consumers acting reasonably.

69.     Irreparable injury has resulted and continues to result from Kraft's and

Hormel's provision of Products with fat contents that are approximately **ten multiples** of the content promised prominently and clearly by Kraft's and Hormel's Product labels. Once Plaintiff ingested the Products and fed them to his family, those Products were assimilated into the very structure of each person's body. It is unconscionable to allow Kraft's and Hormel's Products to alter the composition of the physical bodies of Plaintiff, his family, and other consumers in ways that Kraft and Hormel have known would happen, but about which they have intentionally deceived, through acts and omissions, and continue to deceive, Plaintiff, Class members and future purchasers.

70.      Inadequate remedy at law exists because, although Plaintiff and Class members may recover the price of the Products purchased, the prior physical structure of their human bodies is incapable of recovery. Defendants' Products are responsible for unknown increases in medical problems and risks, including the unwanted accumulation of body fat on Plaintiff, Class members and future purchasers, as a direct consequence of ingesting Products *ten times* fattier than Defendants' lead consumers to believe.

71.      Balance of the hardships favors Plaintiff and the Class because it is easier for Defendants to stop fraudulently and deceptively marketing their Products than it is for individual consumers to somehow extract the nine extra servings of fat consumed with the Products from their bodies' cells. To require that Plaintiff and the Class bear the consequences of Defendants' deception would be inequitable.

72.      The public has an interest in being able to shop for necessary food items free from deceptive labels and advertisements. The public has no interest in ingesting Products that contain *ten times* the amounts of fat than prominently stated on the Products' front

labels.   The public interest would not be disserved, and indeed would be advanced, by entering injunctions against Defendants.   See eBay, Inc. v. MercExchange, LLC, 547 U.S. 388 (2006).

73.      The injunction should require Kraft to remove its Percentage-Fat-Free claims from its Products and undertake an advertising campaign to explain the true fat contents of its Products and to clear up the consumer confusion it has caused.

74.      The injunction should require Hormel to remove its Percentage-Fat-Free claims from its Products and undertake an advertising campaign to clear up the consumer confusion about its Products.

## COUNT II
### (Breach of Express Warranty)

75.      Plaintiff re-alleges and incorporates by reference the allegations contained in the paragraphs above, and those that come after as if fully set forth here.

76.      Kraft's Percentage-Fat-Free statements were affirmations of fact describing the Products as containing fat calories equal to the numerical percentage claimed to be fat free.   For example, "98% fat free · 45 calories per serving."  That statement, and Kraft's similar statements on its other Products are express warranties.

77.      Hormel's Percentage-Fat-Free statements were affirmations of fact describing the Products as containing only two, three or four percent fat, i.e. "98% Fat Free," "97% Fat Free," or "96% Fat Free."  As such, those statements are express warranties.

78.      Plaintiff relied on Kraft's express warranty when he purchased Kraft's "98% Fat Free · 45 calories per serving" Oscar Mayer Turkey in the 16 ounce size from Wal-Mart in the last twelve months.

79.     Plaintiff relied on Hormel's express warranty when he purchased Hormel's "98% Fat Free" Turkey from Wal-Mart in the last twelve months.

80.     The Products sitting on the shelves of retail outlets constituted offers by Kraft and Hormel.  Purchase of the Products by Plaintiff and the Class constituted acceptance, at which time a contract was formed.  Plaintiff and the Class paid hard-earned money as consideration for Defendants' Products.  The terms of the resulting contracts include the promises and affirmation of fact made by Defendants on their Product labels.  The Product labeling and advertising constitutes express warranties that became part of the basis of the bargain, and that forms part of a standardized contract between Plaintiff and Kraft, and also between Plaintiff and Hormel.

81.     All conditions precedent to each Defendant's liability under these contracts have been performed by Plaintiff and the Class.  Plaintiff and the Class are not minors, incompetents, or otherwise, and they all have full capacity to contract.  As demonstrated by their purchases of the Products, Plaintiff and Class members were willing and able to perform.  However, Defendants failed to perform by providing a product inferior to that expressly claimed in their warranties.

82.     Plaintiff did not receive the substantial benefit of the contract with Kraft or Hormel because the Products he bought, ate and fed to his family held approximately *ten multiples* the amount of fat as that expressly warranted by Kraft and Hormel.  This was especially dangerous for Class members suffering from coronary artery, heart disease, or other obesity related diseases.

83.     Kraft breached the terms of its contract, including the express warranties,

with Plaintiff by failing to provide a product capable of fulfilling the express warranties made.

84.     Hormel breached the terms of its contract, including the express warranties, with Plaintiff by failing to provide a product capable of fulfilling the express warranties made.

85.     For Defendants' breaches of contract, Plaintiff and Class members seek the "standard measure" of damages: expectation damages.  Also known as "benefit of the bargain" damages, expectation damages are sufficient damages for Plaintiffs and Class members to buy a substitute performance.

86.     These expectation damages are not speculative, if substitute products that actually conform to the Defendants' original Percentage-Fat-Free claims are available for purchase by Plaintiff and Class members.  However, if there are no products that actually conform to the Defendants' original Percentage-Fat-Free claims, i.e. no substitute products, then Plaintiffs and Class members seek "reliance damages."

87.     If expectation damages will be too speculative to measure (e.g., no products that are truly Percentage-Fat-Free by calories exist), Plaintiff and Class members elect to recover damages based on a "reliance" measure rather than an expectation measure. Reliance damages award the purchasers the cost of their performance; i.e., they attempt to put the Plaintiff and Class members in the positions they would have been in had the contract never been formed.

88.     Plaintiff is entitled to attorney's fees and costs, as allowed under contract law.

89.     Plaintiff and the Class have been damaged in the amount of the purchase price of the Products they purchased, but they have also suffered consequential damage:  As a result of each Defendant's breach of its contracts, Plaintiff and the Class have ingested Products containing *ten times* the amounts of fat they believed the Products to contain.  As a result, Plaintiff and the Class have suffered added difficulty maintaining their health.

90.     These consequential damages were foreseeable by a reasonable person at the time of entry into the contracts.  Kraft sold to Plaintiff, and continues to sell, Products expressly promising certain caloric percentages to be free of fat, but well knows that its Products actually contain about *ten times* the amounts of fat claim on the labels.

91.     A reasonable person in Kraft's position, even absent Kraft's advanced knowledge of nutrition, would have foreseen that Plaintiff's health would be impacted by ingesting, and feeding to his family, ten times more fat than he thought.  Plaintiff's health, and that of his family, was negatively impacted by ingesting Kraft's Product.

92.     Hormel sold to Plaintiff, and continues to sell, Products expressly promising certain percentages to be free of fat, but well knows that its Products actually contain about *ten times* as much fat as the labels claim.

93.     A reasonable person in Hormel's position, even absent Hormel's advanced knowledge of nutrition, would have foreseen that Plaintiff's health, and that of his family, would be impacted by ingesting ten times the amount of fat than they thought they were. Plaintiff's and his family's health was negatively impacted by ingesting Hormel's Product.

## COUNT III
### (Breach of the Uniform Commercial Code, Adopted by Florida and Each State)

94.     Plaintiff re-alleges and incorporates by reference the allegations contained in the paragraphs above, and those that come after as if fully set forth here.

95.     Article 2 of the Uniform Commercial Code (UCC) has been adopted by all the U.S. states and territories and applies to transactions in goods, including the attempted contracts involving the sale of the Products at issue here, as they are tangible, movable goods.  The allegations above, in Count II, of contract formation are herein incorporated into this Count III.  Contracts were similarly formed between Plaintiff and Defendants under the UCC, and the Percentage-Fat-Free claims constitute express warranties.

96.     Florida has codified its UCC statutes.  <u>See</u> Fla. Stat. §§ 672.101.

97.     A "merchant" means a person who deals in goods of the kind "or in goods involved in the transaction."  Fla. Stat. § 672.104.

98.     Kraft is a merchant with respect to its Products because its business deals, in part, in the provision, marketing and distribution of lunchmeat and the Kraft Product purchased by Plaintiff is a "good" because it was tangible and movable at the time of sale.

99.     Hormel is a merchant with respect to its Products because its business deals, in part, in the provision, marketing and distribution of lunchmeat and the Hormel Product purchased by Plaintiff is similarly a "good."

100.     "Goods" means all tangible "things" which are movable at the time of identification to the contract for sale" .ö  Fla. Stat. § 672.105.

101.     Kraft and Hormel each separately had a duty of good faith to Plaintiff.  The UCC requires all parties to act in good faith.  Good faith is defined as "honesty in fact and

the observance of reasonable commercial standards of fair dealing.ö  U.C.C. § 1-201(20);

Fla. Stat. § 672.103.

102.    Kraft breached its duty of good faith and fair dealing toward Plaintiff by

knowingly applying deceptive and misleading statements to its Productsø labels, and by

failing to include any sort of explanatory phrase.

103.    Hormel breached its duty of good faith and fair dealing toward Plaintiff by

knowingly applying deceptive and misleading statements to its Productsø labels, and by

failing to include any sort of explanatory phrase.

104.    Express warranty: õAny affirmation of fact or promise made by the seller to

the buyer which relates to the goods and becomes part of the basis of the bargain creates an

express warranty that the goods shall conform to the affirmation or promise.ö  Fla. Stat. §

672.313.

105.    Kraftøs Product made the express warranty õ98% fat free · 45 calories per

serving,ö but the Product delivered inside the container was not 2% fat as Kraftøs express

warranty claimed, but instead was actually 22% fat, because 10 of those 45 calories came

from fat.

106.    Hormeløs Product made the express warranty õ98% Fat Free,ö but the

Product delivered inside the container was not 2% fat as Hormeløs express warranty

claimed, but instead was actually 22% fat.

107.    Defendantsø express warranties extend to Plaintifføs family.   õA sellerøs

warranty whether express or implied extends to any natural person who is in the family or

household of his or her buyerí  .ö  Fla. Stat. § 672.318.  Plaintifføs wife resides with him and

is a member of his family or household.

108.    Plaintiff and his wife ate Kraft's Products that Plaintiff purchased.

109.    Plaintiff and his wife ate Hormel's Products that Plaintiff purchased.

110.    The UCC applies the "perfect tender" rule, which requires that goods conform precisely to the terms of the contracts governing their delivery.  "If the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may" reject them. Fla. Stat. § 672.601.

111.    Kraft's goods did not conform to Kraft's express warranty.  The express warranty on the Kraft's Product's label that the meat inside was "98% fat free · 45 calories per serving" required that meat to conform to the claims made on the label – but the Product did not conform because it contained about *ten times* more fat by calories as the label expressly claimed.

112.    Hormel's goods did not conform to Hormel's express warranty.  The express warranty on the Hormel's Product's label that the meat inside was "98% Fat Free" required that meat to conform to the claims made on the label – but the Product did not conform because it contained about *ten times* more fat than the label expressly claimed.

113.    Each retail Product constitutes a separate commercial unit.

114.    "The buyer may revoke her or his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him or her."  Fla. Stat. § 672.608.

115.    Plaintiff can revoke his acceptance of Kraft's goods because they did not conform to Kraft's express warranties.  See Fla. Stat. § 672.608.

116.    Plaintiff can revoke his acceptance of Hormel's goods because they did not

conform to Kraft's express warranties.  See Fla. Stat. § 672.608.

117.    The difference between the Products as described in the express warranties and the actual meat inside the packages was, and is, substantial, and the value of the Products to Plaintiff and Class members is substantially impaired.

118.    Plaintiff did not know the true percentages of calories from fat delivered by the Products because of the difficulty of discovering that non-conformance, and because of the Defendants' express claims – assurances – that the meats inside conformed to the contract.

119.    This complaint constitutes prompt notice to Kraft of its breach.  Plaintiff learned of Kraft's breach only in late March, 2011 and contacted Plaintiff's Counsel at that time.

120.    This complaint constitutes prompt notice to Hormel of its breach.  Plaintiff learned of Hormel's breach only in late March, 2011 and contacted Plaintiff's Counsel at that time.

121.    Under the UCC, buyers may recover as damages "loss resulting in the normal course of events from the breach." U.C.C. § 2-714; See Fla. Stat. § 672.701 et seq.  "Where the seller fails to make delivery or… the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract, the buyer may cancel and… recover[] so much of the price as has been paid." Fla. Stat. § 672.711(1).

122.    Here, Plaintiff has rightfully rejected or justifiably revoked acceptance with respect to Kraft's Oscar Mayer "98% fat free · 45 calories per serving" Turkey, with respect

to the whole contract.  Plaintiff seeks recovery of the price he paid for Kraft's Product.

123.    Similarly, Plaintiff has rightfully rejected or justifiably revoked acceptance with respect to Hormel's Natural Choice ô98% Fat Freeö Turkey, with respect to the whole contract.  Plaintiff seeks recovery of the price he paid for Hormel's Product.

124.    Alternatively, Plaintiff is entitled to the difference between the value of the goods he accepted and the value the goods would have had if they had been as warranted. See Fla. Stat. § 672.714.

125.    Plaintiff is entitled to the difference between the value of the Kraft Product he purchased, if he accepted it, and the value that Product would have had if it had actually been 98% fat free by calories.

126.    That difference in value is the premium Kraft charges for its Products over the price charged by competitors for comparable products that are truthfully labeled.

127.    Plaintiff is entitled to the difference between the value of the Hormel Product he purchased, if he accepted it, and the value that Product would have had if it had actually been 98% fat free.

128.    That difference in value is the premium Hormel charges for its Products over the price charged by competitors for comparable products that are truthfully labeled.

129.    Additionally, consequential damages resulting from Kraft's breach include ingesting meat that was ten times fattier than Kraft expressly claimed.  See Fla. Stat. § 672.715.  Kraft had reason to know that Plaintiff sought particular nutritional requirements when purchasing Kraft's Product, as evinced by Kraft's express claims.  Kraft put those claims on the labels to induce purchases.  Ingesting meat that was ten times as fat as Kraft

claimed it was constituted an injury to Plaintiff, and to Plaintiff's wife, who also ate the Product.

130.     Consequential damages resulting from Hormel's breach include ingesting meat that was ten times fattier than Hormel expressly claimed.  See Fla. Stat. § 672.715. Hormel had reason to know that Plaintiff sought particular nutritional requirements when purchasing Hormel's Product, as evinced by Hormel's express claims.  Hormel put those claims on the labels to induce purchases.  Ingesting meat that was ten times fattier than Hormel claimed it was constituted an injury to Plaintiff, and to Plaintiff's wife, who also at the Product.

131.     Plaintiff seeks specific performance in the form of replevin from Kraft of the money he paid for Kraft's Product.  See Fla. Stat. § 672.716.

132.     Plaintiff also seeks specific performance in the form of replevin from Hormel of the money he paid for Hormel's Product.

## COUNT IV
### (Unfair or Deceptive Acts in Violation of Each State's "Little FTC" Acts)

133.     Plaintiff re-alleges and incorporates by reference the allegations contained in the paragraphs above, and those that come after as if fully set forth here.

134.     This cause of action is brought by Plaintiff pursuant to Florida's Deceptive and Unfair Trade Practices Act.  See Fla. Stat. § 501.201.

135.     This cause of action is brought on behalf of Class members pursuant to each state's unfair or deceptive acts and practices (UDAP) statutes, i.e. the "Little FTC" Acts (hereafter "Acts").  The Act of each state follows the Federal Trade Commission Act and provides for a private cause of action.

36

136.     õConsumerö means õan individualí   .ö  Fla. Stat. § 501.203(7).

137.     Plaintiff and Class members are consumers as defined under these Acts.

138.     The FTC Act prohibits an act or practice that violates either the standards for õunfairness,ö or those for õdeceptionö ó the two are independent of each other.  An act or practice may be found to be unfair where it õcauses or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.ö  15 U.S.C. § 45(n).  An act or practice is deceptive if it is likely to mislead a consumer acting reasonably under the circumstances.

139.     Defendantøs Percentage-Fat-Free claims were both unfair and deceptive.

140.     The Acts of Florida and the other states substantially follow the FTC Act.

141.     Floridaøs Act defines a violation:

õViolation of this partø means any violation of this act or the rules adopted under this act and may be based upon any of the followingí

(a) Any rules promulgated pursuant to the Federal Trade Commission Act, 15 U.S.C. ss. 41 et seq.;
(b) The standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or the federal courts;

(c) Any law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices.[24]

142.     Kraftøs deceptive misrepresentations on its labels, websites and other advertising that its Products are particular Percentages-Fat-Free by calories are material and

---

[24] Fla. Stat. § 501.203(3).

are likely to and did deceive ordinary consumers acting reasonably, including the Plaintiff, into believing its products had *ten times* less caloric fat than they actually had.

143.    An act or practice is material if it is likely to affect a consumer's decision regarding the product.  Generally, statements about the costs or benefits of products are material, and *express claims made will be presumed to be material*.  See Central Hudson Gas & Elec. Co. v. PSC, 447 U.S. 557, 567 (1980).[25]  Here, Defendants' specifically included express claims on their Products, knowing that such claims would induce consumers to consummate the purchase.

144.    Hormel's deceptive misrepresentations on its labels, websites and other advertising that the Products are particular Percentages-Fat-Free, are material and are likely to and did deceive ordinary consumers acting reasonably, including the Plaintiff, into believing its products had *ten times* less fat than they actually had.

145.    Florida's Act declares the acts and omissions of Kraft and Hormel to be unlawful.  The statute says:

> (1)    Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

> (2)    It is the intent of the Legislature that, in construing subsection (1), due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. s. 45(a)(1) as of July 1, 2006.

Fla. Stat. § 501.204.

---

[25] See also, FTC Deception Policy Statement, appended to Cliffdale Associates, Inc., 103 F.T.C. 110, 174-84 (1983).

146.     Kraft's practices have caused substantial injury to Plaintiff and Class members by depriving them of money they would have spent elsewhere and by delivering Products that are *ten times* as fat as consumers, Plaintiff included, reasonably believed them to be.

147.     Hormel's practices have caused substantial injury to Plaintiff and Class members by depriving them of money they would have spent elsewhere and by delivering Products that are *ten times* as fat as consumers, Plaintiff included, reasonably believed them to be.

148.     Kraft's unfair express warranties injure both consumers and competition. Consumers are injured in all the ways that Plaintiff has been injured, as described throughout this complaint, and competition suffers in several ways too: (1) honest companies lose market share to those mislabeling their products as already described; (2) the Defendants and other dishonest competitors are rewarded for their deceit with billions of dollars in revenues (which should all be disgorged); and (3) competitors behaving deceptively creates a "race to the bottom," wherein additional companies feel economic pressure to similarly mislabel their products to avoid losing further market share.  There are no countervailing benefits of Kraft's conduct: not to consumers, nor to competition.

149.     Hormel's unfair express warranties injure both consumers and competition. Consumers are injured in all the ways that Plaintiff has been injured, as described throughout this complaint.  There are no countervailing benefits of Hormel's conduct: not to consumers, nor to competition.

150.     Defendants violated and continue to violate the Acts of each state by engaging in the trade practices described above, that have caused and continue to cause substantial

injury to consumers, which are not reasonably avoidable by the consumers themselves, in transactions with Plaintiff and the Class which were intended to result in, and did result in, the sale of the Percentage-Fat-Free Products.

151.     There were reasonable alternatives available to further Defendants' legitimate business interests, other than the conduct described herein.  Defendants, for example, could have abstained from making the Percentage-Fat-Free claims.

152.     Defendants deceived Plaintiff and consumers, and violated the Acts of each state by representing through their labels and advertisements the Products as described above when Defendants knew, or should have known, that the representations and advertisements were unsubstantiated, false and misleading:

  a.   Alabama's Deceptive Trade Practices Act declares deceptive practices unlawful.  Ala. Code §§ 8-19-1 *et seq.*;

  b.   Alaska's Unfair Trade Practices and Consumer Protection Act. Alaska Stat. §§ 44.50.471 *et seq.*;

  c.   Arizona's Consumer Fraud Act.  Ariz. Rev. Stat. §§ 44-1521 *et seq.*;

  d.   Arkansas's Deceptive Trade Practices Act prohibits "false, or deceptive acts or practices in business, commerce, or trade."  Ark. Code §§ 4-88-101 *et seq.*;

  e.   California's Consumer Legal Remedies Act, and also the Unfair Competition Law.  Cal Civ. Code §§ 1750 *et seq.*, and Cal. Bus. & Prof. Code §§ 17200 *et seq.*, respectively;

  f.   Colorado's Consumer Protection Act.  Colo. Rev. Stat. §§ 6-1-101 *et seq.*;

  g.   Connecticut's Unfair Trade Practices Act.  Conn. Gen. Stat. §§ 42-110a *et seq.*;

  h.   Delaware's Consumer Fraud Act, and also its Uniform Deceptive Trade Practices Act.  Del. Code, Title 6 §§ 2511-2571, 2580-2584, and Title 6 §§ 2531-2536, respectively;

i.      District of Columbia's Act.  D.C. Code §§ 28-3901 *et seq.*;

j.      Florida's Deceptive and Unfair Trade Practices Act.  Fla. Stat. §§ 501.201 *et seq.*;

k.      Georgia's Uniform Deceptive Trade Practices Act, and also the Fair Business Practices Act.  Ga. Code §§ 10-1-370 *et seq.*, and §§ 10-1-390 *et seq.*;

l.      Hawaii's Uniform Deceptive Trade Practices Act.  Haw. Rev. Stat. §§ 480-24 *et seq.*, §§ 484A-1 *et seq.*;

m.      Idaho's Consumer Protection Act.  Idaho Code §§ 48-601 *et seq.*;

n.      Illinois's Consumer Fraud and Deceptive Business Practices Act, and also its Uniform Deceptive Trade Practices Act.  815 Ill. Comp. Stat. 505/1 *et seq.*, and 815 Ill. Comp. Stat. 510/1 *et seq.*;

o.      Indiana's Deceptive Consumer Sales Act.  Ind. Code §§ 24-5-0.5-1 *et seq.*;

p.      Iowa's Act.  Iowa Code §§ 714.16 *et seq.*;

q.      Kansas's Consumer Protection Act.  Kan. Stat. §§ 50-623 *et seq.*, 50-676 *et seq.*;

r.      Louisiana's Unfair Trade Practices and Consumer Protection Law.  La. Rev. Stat. §§ 51:1401 *et seq.*;

s.      Maine's Unfair Trade Practices Act, and also its Uniform Deceptive Trade Practices Act.  Me. Rev. Stat., Title 5 §§ 205-A *et seq.*, and Title 10 §§ 1211 *et seq.*, respectively;

t.      Maryland's Consumer Protection Act.  Md. Code Com. Law §§ 13-101 *et seq.*;

u.      Massachusetts's Consumer Protection Act.  Mass. Gen. Laws ch. 93A §§ 1 *et seq.*;

v.      Michigan's Consumer Protection Act.  Mich. Comp. Laws §§ 445.901 *et seq.*;

w.      Minnesota's Uniform Trade Practices Act, and its False Statement in Advertising Act, and also its Prevention of Consumer Fraud Act.  Minn. Stat. §§ 8.31, 325D.43 *et seq.*, and §§325F.68 *et seq.*;

x.   Mississippi's Consumer Protection Act.  Miss. Code §§ 75-24-1 *et seq.*;

y.   Missouri's Merchandising Practices Act.  Mo. Rev. Stat. §§ 407.010 *et seq.*;

z.   Montana's Unfair Trade Practices and Consumer Protection Act.  Mont. Code §§ 30-14-101 *et seq.*;

aa.  Nebraska's Consumer Protection Act, and also its Uniform Deceptive Trade Practices Act.  Neb. Rev. Stat. §§ 59-1601 *et seq.*, and §§ 87-301 *et seq.*;

bb.  Nevada's Trade Regulation and Practices Act.  Nev. Rev. Stat. §§ 598.0903 *et seq.*, and § 41.6000;

cc.  New Hampshire's Consumer Protection Act.  N.H. Rev. Stat. §§ 358-A:1 *et seq.*;

dd.  New Jersey's Consumer Fraud Act.  N.J. Stat. §§ 56:8-1 *et seq.*;

ee.  New Mexico's Unfair Practices Act.  N.M. Stat. §§ 57-12-1 *et seq.*;

ff.  New York's Act.  N.Y. Exec. Law § 63(12), N.Y. Gen. Bus. Law §§ 349 *et seq.*;

gg.  North Carolina's Act.  N.C. Gen. Stat. §§ 75-1.1 *et seq.*;

hh.  North Dakota's Consumer Fraud Act.  N.D. Cent. Code §§ 51-15-01 *et seq.*;

ii.  Ohio's Consumer Sales Practices Act, and also its Deceptive Trade Practices Act.  Ohio Rev. Code §§ 1345.01 *et seq.*, and §§ 4165.01 *et seq.*;

jj.  Oklahoma's Consumer Protection Act, and also its Deceptive Trade Practices Act.  Okla. Stat., Title 15 §§ 751 *et seq.*, Title 78 §§ 51 *et seq.*, respectively;

kk.  Oregon's Unlawful Trade Practices Law.  Or. Rev. Stat. §§ 646.605 *et seq.*;

ll.  Pennsylvania's Unfair Trade Practices and Consumer Protection Law.  73 Pa. Stat. §§ 201-1 *et seq.*;

mm.  Rhode Island's Unfair Trade Practices and Consumer Protection Act. R.I. Gen Laws §§ 6-13.1-1 *et seq.*;

nn.  South Carolina's Unfair Trade Practices Act.  S.C. Code §§ 39-5-10 *et seq.*;

oo.  South Dakota's Deceptive Trade Practices and Consumer Protection Law.  S.D. Cod. Laws §§ 37-24-1 *et seq.*;

pp.  Tennessee's Consumer Protection Act.  Tenn. Code §§ 47-18-101 *et seq.*;

qq.  Texas's Deceptive Trade Practices – Consumer Protection Act.  Tex. Bus. & Com. Code §§ 17.41 *et seq.*;

rr.  Utah's Unfair Practices Act, and its Consumer Sales Practices Act, and also its Truth in Advertising Act.  Utah Code §§ 13-2-1 *et seq.*, 13-5-1 *et seq.*, and §§ 13-11-1 *et seq.*, and also §§ 13-11a-1 *et seq.*, respectively;

ss.  Vermont's Consumer Fraud Act.  Vt. Stat., Title 9 §§ 2451 *et seq.*;

tt.  Virginia's Consumer Protection Act.  Va. Code §§ 59.1-196 *et seq.*;

uu.  Washington's Consumer Protection Act.  Wash. Rev. Code §§ 19.86.010 *et seq.*;

vv.  West Virginia's Consumer Credit and Protection Act.  W. Va. Code §§ 46A-6-101 *et seq.*;

ww.  Wisconsin's Deceptive Trade Practices Act.  Wis. Stat. §§ 100.18 *et seq.*;

xx.  Wyoming's Consumer Protection Act.  Wyo. Stat. §§ 40-12-101 *et seq.*; and

yy.  the equivalent and applicable laws in the other remaining U.S. territories.

153.    Kraft is liable for attorney's fees and reasonable costs pursuant to Fla. Stat. § 501.2105, and the comparable statutes of the other states, as described above, if Plaintiff and Class members prevail.

154.    Hormel is liable for attorney's fees and reasonable costs pursuant to Fla. Stat.

§ 501.2105, and the comparable statutes of the other states, as described above, if Plaintiff and Class members prevail.

155.    Plaintiff seeks a declaratory judgment under Fla. Stat. § 501.2105.

156.    Plaintiff and the Class reserve the right to allege other violations of law which constitute other unlawful business acts or practices.  Such conduct is ongoing and continues to this date.

## COUNT V
## (Fraudulent, Intentional Misrepresentation)

157.    Plaintiff re-alleges and incorporates by reference the allegations contained in the paragraphs above, and those that come after as if fully set forth here.

158.    Defendants represented to Plaintiff and Class members that the Products were comprised of certain Percentages-Fat-Free, but their representations were false: the Products were comprised of about *ten times* as much fat as Defendants expressly claimed.  See Essex Ins. Co. v Universal Entertainment & Skating Center, Inc., 665 So. 2d 360 (Fla. 5th DCA 1995) (discussing fraud generally).

159.    Kraft not only knew that the marketing of its own Products as Percentage-Fat-Free products was, and continues to be, false, deceptive and untrue, but Kraft also intended for Plaintiff and Class members to rely on its deceptive statements: õ98% fat free · 45 calories per serving.ö

160.    Kraftøs fraud is comprised both of that affirmative misrepresentation, i.e. the Percentage-Fat-Free claim, and also of omissions.  The omissions arise as a result of Kraftøs failures to properly disclaim its affirmative statements.  Inherent ambiguity in the bare claim õ___ percent fat freeö misleads ordinary consumers acting reasonably.  To avoid this result,

each Percentage-Fat-Free claim must be accompanied by some sort of clarifying phrase, such as "not by calories."

161.    Plaintiff and Class members did not know Kraft's statements were false.

162.    Plaintiff and Class members, acting as ordinary consumers, reasonably relied on Kraft's representations.  Plaintiff had a right to rely on Kraft's representations.  Plaintiff's and Class members' reliance on Kraft's express warranties was a substantial factor in causing their harm.  The Percentage-Fat-Free statements were and are material, and Plaintiff and Class members reasonably believed them to refer to calories.

163.    Plaintiff and Class members were damaged in the amount of money required to purchase Kraft's Product.

164.    Similarly, Hormel not only knew that the marketing of their own Products as Percentage-Fat-Free products was, and continues to be, false, deceptive and untrue, but Hormel also intended for Plaintiff and Class members to rely on its deceptive statements: "98% Fat Free."

165.    Hormel's fraud is comprised both of that affirmative misrepresentation, i.e. the Percentage-Fat-Free claim, and also of omissions.  The omissions arise as a result of Hormel's failures to properly disclaim its affirmative statements.  Inherent ambiguity in the bare claim "___ percent fat free" misleads ordinary consumers acting reasonably.  To avoid this result, each Percentage-Fat-Free claim must be accompanied by some sort of clarifying phrase, such as "not by calories."

166.    Plaintiff and Class members did not know Hormel's statements were false.

167.    Plaintiff and Class members, acting as ordinary consumers, reasonably relied

on Hormel's representations.   Plaintiff had a right to rely on Hormel's representations. Plaintiff's and Class members' reliance on Hormel's express warranties was a substantial factor in causing their harm.  The Percentage-Fat-Free statements were and are material, and Plaintiff and Class members reasonably believed them to refer to calories.

168.     Plaintiff and Class members were damaged in the amount of money required to purchase Hormel's Product.

169.     Plaintiff and the Class seek punitive damages from Kraft.

170.     Plaintiff and the Class seek punitive damages from Hormel.

171.     Defendants, Kraft and Hormel, had and continue to have a duty of good faith, which implicitly includes a duty not to mislead consumers.  And they certainly have a duty not to *try to deceive* consumers.  But that is exactly what Defendants have done and continue to do: they try to deceive or mislead consumers into believing that their Products are "___ % Fat Free" by calories.

172.     Defendants' misrepresentations harmed Plaintiff and Class members, both monetarily – in the amounts these consumers spent on the Products – and physically, by inducing Plaintiff and Class members to ingest Products *ten times* fattier than they reasonably believed them to be.

173.     By intending to deceive consumers, Plaintiff and Class members included, Defendants breached their duties of good faith and fair dealing, which has directly and proximately caused damage to Plaintiff and Class members.

174.     To remedy Defendants' intentional misrepresentations to consumers, and omission of clarifying statements on their labels, Plaintiff and Class members seek to rescind the contracts, and thereby disgorge all monies paid to Defendants for these Products.

## COUNT VI
### (Negligent Misrepresentation)

175.     Plaintiff re-alleges and incorporates by reference the allegations contained in the paragraphs above, and those that come after as if fully set forth here.

176.     Kraft made a false statement on its labels concerning a material fact.  That statement was in fact false.  That statement was "98% fat free · 45 calories per serving."

177.     Kraft was negligent in making the statement because it should have known the statement was false; Kraft should have known that not one calorie (which it would have been at 98% fat free), but rather ten of those forty-five calories came from fat.

178.     Kraft, in making that statement intended, or expected, that Plaintiff and Class members would rely on the statement.

179.     Plaintiff justifiably relied on Kraft's statement about its own Product, and would not have purchased Kraft's Product but for the false statement.  Plaintiff is damaged in an amount equal to the price he paid for Kraft's Product.

180.     Similarly, Hormel made a false statement on its labels concerning a material fact.  That statement was in fact false.  That statement was "98% Fat Free."

181.     Hormel was negligent in making the statement because it should have known the statement was false; Hormel should have known that ten of those forty-five calories per serving came from fat.

182.     Hormel, in making that Percentage-Fat-Free statement intended, or expected, that Plaintiff and Class members would rely on the statement.

183.     Plaintiff justifiably relied on Hormel's statement about its own Product, and would not have purchased Hormel's Product but for the false statement.  Plaintiff is damaged in an amount equal to the price he paid for Hormel's Product.

184.     The Defendants' claims were material and directly and proximately caused ordinary consumers acting reasonably, Plaintiff and Class members included, to buy the Products.   Without Defendants' deceptive claims, the products would not have been purchased, and Plaintiffs would not have suffered damages.

185.     Plaintiff seeks punitive damages from Kraft.

186.     Plaintiff seeks punitive damages from Hormel.

## COUNT VII
### (Unjust Enrichment, Money Had and Received)

187.     Plaintiff re-alleges and incorporates by reference the allegations contained in the paragraphs above, and those that come after as if fully set forth here.

188.     Unjust enrichment results from a transfer that is ineffective to conclusively alter ownership rights.[26]   Here, Kraft's and Hormel's ("Defendants") misrepresentations made Plaintiff and Class members believe that a term material to the contract was different than it actually was.  Morally and ethically – and therefore, in equity – the Defendants have gained a benefit for which they have not exchanged the promised consideration.  Defendants promised meats that were certain Percentages-Fat-Free, but instead delivered meats that were about *ten times* fattier than promised.  This constitutes a total failure of consideration.

---

[26] See Restatement, Third, of Restitution and Unjust Enrichment, § 1, comment b (Discussion Draft 2000).

189.     Defendants, through their deceptive labels, cultivated in consumers a mistake of fact that would not have existed but for Defendants' affirmative actions and express warranties.

190.     Because of Kraft's deceptive Percentage-Fat-Free claims, Plaintiff and Class members conveyed a benefit to Kraft by purchasing its Products.  Kraft appreciated the benefit conferred on it by Plaintiff in this transaction because it was enriched in the amount Plaintiff paid for the Product.

191.     Because of Hormel's deceptive Percentage-Fat-Free claims, Plaintiff and Class members conveyed a benefit to Hormel by purchasing its Products.  Hormel appreciated the benefit conferred on it by Plaintiff in this transaction because it was enriched in the amount Plaintiff paid for the Product.

192.     Plaintiff has no adequate remedy at law due to the difficulty of quantifying damages caused by ingesting meat that was ten times fattier than he reasonably believed it to be.  Defendants' Products are responsible for unknown increases in medical problems and health risks of and to Plaintiff, his family, Class members and future purchasers, as a direct consequence of ingesting Products *ten times* fattier than Defendants' lead consumers to believe.

193.     Plaintiff and Class members lacked the requisite intent to form a contract for the Products that they actually received.  There can be no valid contract without intent.

194.     Products supplied were inadequate consideration for the monies paid.  These contracts also fail for want of consideration.

195.     Kraft and Hormel each accepted and retained money paid to them by Plaintiff. The affirmative, knowing and intentional misrepresentations and omissions of Kraft and Hormel, which Plaintiff reasonably relied upon, constitute circumstances that make it inequitable for Kraft and Hormel to retain Plaintiff's money.

## COUNT VIII
### (Quantum Meruit)

196.     Plaintiff re-alleges and incorporates by reference the allegations contained in the paragraphs above, and those that come after as if fully set forth here.

197.     The law imputes the existence of a contract based upon Plaintiff having paid money to Kraft under circumstances in which Kraft must have understood and intended that Plaintiff wanted a product that was "98% fat free · 45 calories per serving." See Tipper v. Great Lakes Chem. Co., 281 So. 2d 10 (Fla. 1973).

198.     Plaintiff acquiesced by paying for Kraft's Product.

199.     Kraft was aware that Plaintiff expected to receive meat that was 98% fat free by calories.

200.     Kraft failed to deliver to Plaintiff meat that was 98% fat free by calories.

201.     Plaintiff was damaged in the value of money he paid for Kraft's Product.

202.     Similarly, the law imputes the existence of a contract based upon Plaintiff having paid money to Hormel under circumstances in which Hormel must have understood and intended that Plaintiff wanted a product that was "98% Fat Free."

203.     Plaintiff acquiesced by paying for Hormel's Product.

204.     Hormel failed to deliver to Plaintiff meat that was 98% fat free by calories.

205.     Hormel was aware that Plaintiff expected to receive meat that was 98% fat free by calories.

206.     Plaintiff was damaged in the value of money he paid for Hormel's Product.

**COUNT IX**
**(False Pretenses / Fraudulent Conversion)**

207.     Plaintiff re-alleges and incorporates by reference the allegations contained in the paragraphs above, especially those of Count V, and those that come after as if fully set forth here.

208.     Kraft's and Hormel's frauds are comprised both of affirmative misrepresentations, i.e. the Percentage-Fat-Free claims, and also of omissions.  The omission arises as a result of Defendants' failures to properly disclaim their affirmative statements.  Inherent ambiguity in the bare "___% fat free" claims misleads ordinary consumers acting reasonably.  Kraft not only knew that the marketing of its own Products as Percentage-Fat-Free products was, and continues to be, false, deceptive and untrue, but Kraft also intended for Plaintiff and Class members rely on its deceptive statements: "98% fat free · 45 calories per serving."  Hormel not only knew that the marketing of its own Products as Percentage-Fat-Free products was, and continues to be, false, deceptive and untrue, but Hormel also intended for Plaintiff and Class members rely on its deceptive statements, such as "98% fat free."  To avoid this result, any Percentage-Fat-Free claim, if made at all, must be accompanied by some sort of clarifying phrase, such as "not by calories."

209.     Plaintiff had clear legal ownership, and right of possession of his monies at the time of his transactions with both Kraft and Hormel.  Both money and intangible property

can be converted.[27]  Plaintiff's money has not been taken for tax, assessment or fine pursuant to law, nor under an execution or attachment against Plaintiff's property.

210.     Amounts converted were the amounts Kraft charged for its Product.

211.     Kraft obtained title to the personal property of Plaintiff through purposely false statements intended to defraud the Plaintiff.   The express warranties, i.e. the Percentage-Fat-Free claims, were false statements about the present conditions of the Products at the time they were presented to Plaintiff.

212.     Plaintiff owns and has the right to possess his monies currently in possession of Kraft because Kraft intentionally interfered with the Plaintiff's personal property by deceiving him into buying the Product.   Kraft now exercises dominion and control over Plaintiff's monies, which has deprived Plaintiff of possession and use of his money, and has damaged Plaintiff.

213.     Also with Hormel, amounts converted were the amounts Hormel charged for its Product.

214.     Hormel obtained title to the personal property of Plaintiff through purposely false statements intended to defraud the Plaintiff.   The express warranties, i.e. the Percentage-Fat-Free claims, were false statements about the present conditions of the Products at the time they were presented to Plaintiff.

215.     Plaintiff owns and has the right to possess his monies currently in possession of Hormel because Hormel intentionally interfered with the Plaintiff's personal property by deceiving him into buying the Product.   Hormel now exercises dominion and control over

---

[27] See e.g., State v. Omaha National Bank, 81 N.W. 319 (1899); see also Griggs v. Day, 32 N.E. 612 (1892).

Plaintiff's monies, which has deprived Plaintiff of possession and use of his money, and has damaged Plaintiff.

216.    Plaintiff is entitled to his money back and seeks costs against both Kraft and Hormel, under Fla. Stat. § 78.19.

## COUNT X
### (Trespass to Chattels)

217.    Plaintiff re-alleges and incorporates by reference the allegations contained in the paragraphs above, and those that come after as if fully set forth here.

218.    Kraft intended to place the Percentage-Fat-Free claims on its Product labels and intended that those claims deceive Plaintiff into believing that the claims referred to calories.  Kraft intended that the Plaintiff purchase the Product.

219.    Kraft obtained possession of Plaintiff's money by misleading him as to the true nutritional content of its Product.  Thereby, Kraft interfered with Plaintiff's rights of possession in the money paid to Kraft for the Product.

220.    Similarly, Hormel intended to place the Percentage-Fat-Free claims on its Product labels and intended that those claims deceive Plaintiff into believing that the claims referred to calories.  Hormel intended that the Plaintiff purchase the Product.

221.    Hormel obtained possession of Plaintiff's money by misleading him as to the true nutritional content of the Product.  Thereby, Hormel interfered with Plaintiff's rights of possession in the money paid to Hormel for the Product.

222.    Defendants' claims were material, and directly and proximately caused ordinary consumers acting reasonably, Plaintiff and Class members included, to buy the Products.

223.    Plaintiff was damaged in the amount he paid for the Products.

### COUNT XI
### (Replevin)

224.    Plaintiff re-alleges and incorporates by reference the allegations contained in the paragraphs above, and those that come after as if fully set forth here.

225.    An action for replevin may be maintained to recover any goods or chattels in which the plaintiff has a general or special property interest with a right to immediate possession and which are wrongfully detained from him in any manner, together with the damages for such wrongful detention.  See Fla. Stat. §§ 78.01 et seq.

226.    Here, Plaintiff had clear legal ownership, and right of possession of his monies at the time of his transaction with Kraft.  Kraft has obtained possession of Plaintiff's monies by misleading Plaintiff with regard to the Percentage-Fat-Free claims.   Kraft continues to wrongfully keep Plaintiff's monies, damaging Plaintiff in the amounts paid for Kraft's Product.

227.    Plaintiff also had clear legal ownership, and right of possession of his monies at the time of his transaction with Hormel.  Hormel has obtained possession of Plaintiff's monies by misleading Plaintiff with regard to the Percentage-Fat-Free claims.   Hormel continues to wrongfully keep Plaintiff's monies, damaging Plaintiff in the amount paid for Hormel's Product.

### PRAYER FOR RELIEF

WHEREFORE Plaintiff prays for judgment against Kraft and Hormel as follows:

A.      For an order certifying the Class defined herein, appointing undersigned counsel as Class Counsel, approving Plaintiff as Class

representative, and requiring that notice be provided to the Class at Defendantsø expense, pursuant to Fed. R. Civ. P. 23;

B.       For declaratory and injunctive relief, including enjoining Defendants from continuing to misrepresent the true fat content of their Products, and requiring them to state the percentage fat by calories;

C.       For judgment on behalf of the Class as defined herein for the amount of any payments made to the Defendants with interest thereon;

D.       For exemplary, treble or punitive damages;

E.       For reasonable attorneysø fees and costs; and

F.       For such other and further relief as this Court deems equitable or just under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand a trial by jury on all issues so triable against Defendants.

Respectfully submitted,

_s/ Aaron Mayer_____
Aaron C. Mayer
FBN: 0076983
MAYER LAW GROUP
18 Carolina St., Suite B
Charleston, SC  29403
T: (843) 376-4929
F: (888) 446-3963
aaron@mayerlawgroup.com

Trial Counsel for Plaintiffs